UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONTECH CASTING, LLC,

                   Plaintiff,                              Civil Action No.
                                                 13-CV-10766

vs.

                                               HON. MARK A. GOLDSMITH

ZF STEERING SYSTEMS, LLC,

                   Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I. INTRODUCTION

In this diversity action, Plaintiff Contech Castings, LLC has brought suit against Defendant ZF Steering Systems, LLC for Defendant's failure to pay approximately $3.868 million for automotive parts Plaintiff sold to it. According to Plaintiff, that failure to pay has created an existential threat to the economic survival of the company and will cause incalculable harm to its customers throughout the automotive industry.

Now before the Court is Plaintiff's emergency motion for temporary restraining order and preliminary injunction (Dkt. 6), which seeks to compel Defendant to make payment and thereby facilitate continued financing of Plaintiff's operations. Having conducted four hearings in this matter, including a day-long evidentiary hearing on irreparable harm, and having reviewed numerous briefs with voluminous attachments submitted by the parties, the Court concludes that Plaintiff has not met its burden of showing entitlement to preliminary injunctive relief. Therefore, the motion will be denied.

## II. BACKGROUND

Plaintiff manufactures a variety of automotive parts.[1]  Some are sold directly to automobile manufacturers, and others are sold to Tier-1 and Tier-2 companies, which incorporate the parts into larger component systems that are later sold to automobile manufacturers.  David W. Jaeger[2] Aff. ¶¶ 11-12 (Dkt. 6-2).

Like many other companies in the automotive industry, Plaintiff has had a turbulent economic history.  Although its sales in 2008 were some $350 million, it filed for bankruptcy in 2009 due to "missing bank covenants" and other "financial distress."  Id. ¶ 6; Hr'g Tr. at 11-12.[3]  It was bought by Revstone Industries in 2009 and regained its footing by maintaining some of its larger customers, such as Ford Motor Company, Delphi, and Defendant.  Jaeger Aff. ¶ 6; Hr'g Tr. at 12-13.  Sales for 2013 were projected to be $123 million, with Defendant's share expected to be $45 million.  Jaeger Aff. ¶ 20; Hr'g Tr. at 16.

The relationship between Plaintiff and Defendant extends back to July 2008.  Pierre Abboud[4] Aff. ¶ 6.  Specifically, the parties entered into purchase agreements under which Plaintiff agreed to manufacture and supply to Defendant pinion rack housing systems for inclusion in GM and BMW automobile steering systems.  Under the agreements, Plaintiff was obligated to supply 100% of Defendant's requirements through December 2014 for

---

[1]  Plaintiff sells transmission input housings, suspension links, power rack and pinion housings, lock housings, support housings, front steering knuckles, upper control arm and pivot shaft assemblies, actuator housings, front axle housings, real axle covers, pump housings, PTO housings, radius rods, tilt steering housings, pivot shafts, axle tubes, and steering supports.  Pl. Supp. Br. at 1 n.1 (Dkt. 39).

[2] Jaeger is Plaintiff's president.

[3]  All transcript citations are to the March 15, 2013 hearing transcript (Dkt. 37) unless otherwise specified.

[4] Abboud is Defendant's president and CEO.

certain GM programs, and through December 2013 for certain BMW programs.  Jaeger Aff. ¶ 16.

The relationship between the parties has not been without friction, with each side having its own perspective for the causes.  Defendant points out that, starting soon after the beginning of the parties' contractual relationship, Plaintiff made numerous requests for accommodations, which took the form of requests for cash concessions, price surcharges, funding of replacement tools, and equipment investment.  Abboud Aff. ¶¶ 6, 10, 14, 15; Hr'g Tr. at 86-88, 92-96, 98-99, 101-102, 106.[5]  Defendant states that it agreed to many of these requests "[u]nder duress and . . . solely to mitigate its damages in order to ensure continuity of supply to GM and BMW."  Def. Resp. at 8.

Plaintiff acknowledges these requests, but points out that the requests were necessitated, at least in part, by Defendant's increased demands for larger quantities of goods, which elevated Plaintiff's costs due to accelerated wear and tear and overtime.  Hr'g Tr. at 141-142.

During the course of the relationship, Defendant also expressed concerns regarding Plaintiff's performance.  Abboud Aff. ¶ 6.  For example, in 2010, 2011, and 2012, Defendant had to shut down its own production lines on occasion and send a team of its employees to Plaintiff's facilities to monitor Plaintiff's operations and manufacturing processes.  Id. ¶¶ 7, 9, 11, 12.  Defendant also held several meetings with Plaintiff to address its performance and productivity issues.  Id. ¶ 10.

---

[5] For example, Defendant agreed to provide Plaintiff with short-term cash concessions on September 12, 2011, including over $550,000 in payments to Plaintiff's suppliers and accelerated payment of receivables to Plaintiff.  Defendant later agreed to suspend a "productivity charge" for 2012, resulting in $2 million in costs to Defendant.  Moreover, on January 27, 2012, Defendant agreed to: (i) pay an additional surcharge payment of $1 million, (ii) pay an additional $576,000 for cavity replacements, (iii) pay an additional $438,000 for packaging, (iv) pay an additional $1 million surcharge if Plaintiff met certain specifications regarding delivery and quality, and (v) waive agreed-pricing reductions of 5% for all 2012 deliveries, an approximate value of $1,950,000.  Def. Resp. at 6-8 (Dkt. 15).

3

None of these concerns triggered any formal notice of breach. However, in June 2012, a formal notice of breach was sent by Defendant to Plaintiff after BMW had issued a recall notice affecting some 9,700 vehicles. The recall concerned thermal issues caused by nonconforming housing sold to BMW by Defendant, which included a component part manufactured by Plaintiff and sold to Defendant. Id. ¶ 17.

On June 28, 2012, Defendant sent Plaintiff a letter regarding the recall, claiming that the recall stemmed from Plaintiff's failure to manufacture parts within the specifications called for by the parties' contract. Defendant demanded indemnification from Plaintiff regarding damages stemming from the recall, which were later determined to be approximately $10.9 million. Def. Resp. Ex. M (Dkt. 15-14).

On July 2, 2012, Plaintiff sent a response letter to Defendant denying that Plaintiff's parts were the cause of the recall. In addition, Plaintiff requested assurances from Defendant that it would not offset its accounts payable to Plaintiff in the amount of the damages related to the BMW recall. Plaintiff explained to Defendant that assurances were necessary because Plaintiff would have to notify its lender, Wells Fargo Capital Finance (Wells Fargo), of the recall, and that Wells Fargo would require assurances that Plaintiff would receive payment for the parts that were alleged by Defendant to be the cause of the recall. Plaintiff informed Defendant that it could not continue shipping parts to Defendant unless such assurances were provided. Def. Resp. Ex. N (Dkt. 15-15).

Continued financing of Plaintiff's operations was critical to its economic viability. Jay N. Brown[6] Aff. ¶ 10 (Dkt. 6-9). Plaintiff's on-going expenses were paid by way of an asset-based revolving line of credit issued by Wells Fargo, secured by Plaintiff's accounts receivable, inventory, and equipment. Hr'g Tr. at 153, 207. The financing arrangement allowed Plaintiff to draw down on a line of credit based on 85% of the dollar amount of

---

[6] Brown is Plaintiff's treasurer.

accounts receivable.  Id. at 153-155.  However, one of the conditions for continued financing

was maintaining compliance with a lending formula.  If Defendant's offset was not rescinded,

Plaintiff would be out-of-formula and no longer eligible to borrow against the line of credit.

Pl. Br. at 3 (Dkt. 39).

Defendant responded to Plaintiff's letter the same day providing the requested

assurances.  In relevant part, Defendant wrote:

> ZF commits and agrees that it will not issue any offset or debits as to the ZF
> payables to Contech for costs arising from or related to the BMW Recall.

Def. Resp. Ex. O (Dkt. 15-16).

The relationship continued, with Plaintiff continuing to ship several million dollars'

worth of goods.  Pl. Br. at 4 (Dkt. 6).  However, with no apparent warning, and despite its

promise not to exercise any offset regarding the BMW recall, Defendant notified Plaintiff by

email, on February 15, 2013, that it would now be claiming the offset.  Defendant wrote, in

relevant part:

> As you are aware ZF has a right to offset from our payables to recover [BMW
> recall] costs and we have debited our payables to Contech to recover these
> costs.  Further, ZF will continue to debit our payables to Contech until such
> time as ZF fully recovered all of these costs.

Pl. Ex. G (Dkt. 6-8).  Defendant applied the offset to payables for parts that Plaintiff had

already delivered to Defendant, prompting Plaintiff to stop all delivery of its parts to

Defendant from that point forward.

Currently, Plaintiff alleges that Defendant owes it approximately $3.868 million – the

approximate amount of offsets so far debited by Defendant against payables for Plaintiff's

shipment of goods.  Plaintiff alleges that its continued existence depends on its immediate

receipt of this money from Defendant:

> Because this revenue is critical to maintaining a positive cash flow and lines
> of credits necessary for daily operation, Contech had no choice but to lay off
> 234 highly skilled workers last week and now faces imminent shutdown of its

four facilities in three separate states and the impending layoff of another 400 employees.

Pl. Br. at 6 (Dkt. 6).

The extent to which the offset, in fact, created imminent irreparable harm for Plaintiff was explored extensively at the day-long evidentiary hearing on March 15, 2013. A detailed discussion of the evidence elicited at that hearing is recited in the Court's discussion of irreparable harm.

### III.  ANALYSIS

#### A.  Legal Standard

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to issue a preliminary injunction, courts balance the following four factors:

> (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.

Id.  "These factors are not prerequisites, but are factors that are to be balanced against each other."  Id.  "The factors to be weighed before issuing a TRO are the same as those considered for issuing a preliminary injunction."  Monaghan v. Sebelius, ___ F. Supp. 2d ___, 2012 WL 6738476, at *3 (E.D. Mich. Dec. 30, 2012).

#### B.  Discussion

#### 1.  Likelihood of Success on the Merits

Plaintiff alleges that Defendant breached its contract with Plaintiff by offsetting its payables in response to the BMW recall, despite having previously assured Plaintiff via

Defendant's July 2, 2012 letter that it would not do so.   The Court agrees with Plaintiff that it is likely to succeed on this claim.[7]

In its July 2, 2012 letter, Defendant promised Plaintiff that it would not offset its payables to Plaintiff for damages arising out of the BMW recall.  The waiver language used by Defendant is unambiguous and, by doing exactly what it promised not to do, Defendant manifestly breached.[8]  Defendant attacks the promise it made in its July 2, 2012 letter as "extracted under the duress of unjustified threats to stop shipment."  See Def. Resp. at 16 (Dkt. 15).  But Defendant's terse mention of economic duress is entirely undeveloped and unsupported by any authority or discussion.  Therefore, the Court does not consider the argument.  See Rivet v. State Farm Mut. Auto. Ins. Co., 316 F. App'x 440, 449 (6th Cir. 2009) (refusing to address "arguments that . . . are unsupported or undeveloped.").[9]

Defendant argues that, even if it was not entitled to offset for the damages arising out of the BMW recall, it was nonetheless entitled to offset for other alleged breaches; these damages would far exceed Plaintiff's receivables.  In particular, Defendant alleges in its counterclaim that Plaintiff committed numerous contractual breaches dating back to 2011, and that those other breaches total approximately $20 million.  Defendant argues that, to the extent it was not entitled to exercise an offset for the damages arising out of the BMW recall,

---

[7] Counts I, II, and III of the Second Amended Complaint (Dkt. 26) address Plaintiff's breach claim.  The other counts are based on promissory estoppel, quantum valebant, unjust enrichment, and fraud, but share the same core of operative facts.  Thus, Plaintiff may well succeed on those claims, as well.  However, because those claims raise additional issues that were not briefed, such as scienter (for fraud) and equitable considerations (for the equitable claims), and because the breach claim is sufficient to establish Plaintiff's likelihood of success on the merits, the Court will not separately address the other claims.

[8] The Court notes that Defendant's July 2, 2012 waiver does not prevent Defendant from suing Plaintiff to recover the damages arising out of the BMW recall, but it does prevent it from exercising an offset.

[9] Defendant also argues that the promise not to assert an offset for the BMW recall damages was only "temporary."  Def. Resp. at 10 (Dkt. 15).  The Court rejects this position, because there is nothing in the language of the July 2 letter, or anywhere else in the record, supporting this view.

it nonetheless permissibly offset for these other amounts, which far exceed amounts owed to Plaintiff.  In response, Plaintiff argues that Defendant has waived its right to sue for any breach because it failed to give timely notice of the breach, pursuant to the Uniform Commercial Code (UCC), within a reasonable time after acceptance of the goods.

The Court concludes, at this preliminary stage of the proceedings, that Defendant is likely barred from pursuing its breach of contract claims that are the subject of its counterclaim – with the exception of the breach relating to the BMW recall – because it failed to give Plaintiff sufficient and timely notice of those breaches.  Consequently, the Court determines that Plaintiff is likely to succeed on its breach of contract claim and on its contention that Defendant has no offset right that may be applied to the amount owed.

The pertinent UCC provision regarding notice provides:

> Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

U.C.C. § 2-607(3)(a), adopted as Mich. Comp. Laws § 440.2607.

Two conflicting views – a so-called "lenient" view and a so-called "strict" view – have emerged regarding the sufficiency of notice required under § 440.2607.  See Am. Bumper & Mfg. Co. v. Transtechnology Corp., 652 N.W.2d 252, 255 (Mich. Ct. App. 2002). The lenient view is justified by UCC comment four to this section, which states that the "content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched."  The strict view is justified by other language in the same comment, which states that "[t]he notification which saves the buyer's rights . . . need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

In American Bumper, 652 N.W.2d at 255-256, the Michigan Court of Appeals declined to adopt one view over the other, and instead analyzed whether the notice given in

that case satisfied the policies underlying the UCC's notice provision.[10]  Those policies, as stated by the <u>American Bumper</u> court, are:

> (1) to prevent surprise and allow the seller the opportunity to make recommendations how to cure the nonconformance, (2) to allow the seller the fair opportunity to investigate and prepare for litigation, (3) to open the way for settlement of claims through negotiation, and (4) to protect the seller from stale claims and provide certainty in contractual arrangements.

<u>Id.</u> at 256.  The court concluded that the buyer gave insufficient notice that a breach had occurred because it "did nothing more tha[n] initially notify [the seller] that there was a problem with the [product], and never notified [the seller] that [it was] in breach."  <u>Id.</u>  The court also found the buyer's conduct after it had discovered a problem with the product to be relevant in assessing whether the buyer could reasonably be deemed to have given notice of a breach.  <u>Id.</u> (citing <u>Eastern Air Lines, Inc. v. McDonnell Douglas Corp.</u>, 532 F.2d 957, 976 (5th Cir. 1976) for the proposition that "even if adequate notice is given at some point, subsequent actions by the buyer may negate its effect").

Because Defendant never gave Plaintiff any formal notice of a breach (other than the notice relative to the BMW recall), Defendant relies on a series of so-called "key statements" made by its personnel to Plaintiff that purportedly demonstrate that Plaintiff was given sufficient notice of various unspecified breaches under § 440.2607.  <u>See</u> Def. Supp. Br. at 9-14 (Dkt. 22).  In the cited "key statements," Defendant's personnel (i) pointed out multiple problems regarding Plaintiff's productivity and performance under the parties' contract, (ii) expressed concern and disappointment over Plaintiff's productivity and performance, and (iii) required Plaintiff to provide action plans to address Defendant's concerns.

However, the Court concludes that the "key statements" – other than the statement made on June 28, 2012 relating to the BMW recall – do not demonstrate that the purposes of

---

[10] Not surprisingly, Defendant urges the Court to adopt the lenient approach and Plaintiff urges the Court to adopt the strict approach.  In light of the analysis employed by the <u>American Bumper</u> court, the Court declines to adopt either approach and instead analyzes whether the notice given satisfies the policies underlying the rule.

the notice requirement under § 440.2607 have been met.  Nothing in the statements would have alerted Plaintiff that Defendant believed Plaintiff to be in breach.  Indeed, even in its filing with this Court, Defendant has not explained precisely how each "key statement" references a specific breach of contract.  Finding these statements to constitute notice of a breach would promote unfair "surprise," by depriving a seller of effective notice that its performance was considered so deficient as to be potentially actionable.  The "key statements" (other than the June 28, 2012 statement) certainly did not alert Plaintiff to "prepare for litigation," nor did they protect Plaintiff from stale claims going back several years.  Accordingly, Defendant is not likely to succeed on the issue of timely notice of breach under § 440.2607 – an issue on which it bears the burden of proof.  See Mich. Comp. Laws § 440.2607(4).

Even if the "key statements" could arguably be construed as notices of breach, the Court concludes that Defendant's subsequent conduct in continuing to do business with Plaintiff up until very recently – and long after Plaintiff's purported breaches began – negates the effect of any notice of breach that was arguably given.  See Am. Bumper, 652 N.W.2d at 256 (citing Eastern Air Lines, 532 F.2d at 976).  Subsequent to these "key statements" that supposedly embody notices of breach (except the last four statements, which post-date the February 15 letter), Defendant continued to order and pay for large shipments of goods. Furthermore, where Defendant sought to give notice unambiguously – in connection with the BMW recall – it did so with a formal written notice expressly making known its intent.  To argue, as Defendant does, that its far more opaque conduct amounts to notice of a breach ignores its unequivocal conduct that, by contrast, would lead a reasonable merchant to conclude that no breach claim was being asserted or preserved except as to the BMW recall.[11]

---

[11] Defendant cites four cases in support of its argument that its various "key statements" embody notices of breach.  However, the cited cases are either factually distinguishable or take an approach to analyzing sufficiency other than the one followed in American Bumper:

Because the Court has determined that Defendant is likely barred from seeking damages for breaches other than those damages arising from the BMW recall, and because the BMW-related damages cannot be the subject of an offset, Plaintiff has shown a strong likelihood of succeeding on its breach of contract claim for Defendant's failure to pay Plaintiff's invoices.

### 2. Irreparable Harm

Regarding the second element of the Overstreet framework – irreparable harm – the law is settled that a party moving for a preliminary injunction must establish more than mere monetary injury.  See, e.g., Sampson v. Murray, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."); Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958) ("[I]njuries, however substantial, in terms of money, time and

---

- Fargo Machine & Tool Company v. Kearney & Trecker Corporation, 428 F. Supp. 364 (E.D. Mich. 1977): The court did not analyze the sufficiency of notice given in light of the purposes of the notice rule.

- Chainworks, Inc. v. Webco Industries, Inc., No. 05-CV-135, 2006 WL 461251, at *13 (W.D. Mich. Feb. 24, 2006): The buyer told the seller that it (the buyer) was accepting the goods "in the interest of mitigating our losses" and expressly noted that it was "reserv[ing] all rights and remedies that we may otherwise have under [the parties'] . . . agreement."  Defendant's "key statements" in the present case, other than the June 28, 2012 statement regarding the BMW recall, do not include similar language – language that "clearly informed [the seller] that [the buyer] considered the surcharge to be a breach and that a future action for damages was possible."  Id.

- Crest Container Corporation v. R.H. Bishop Company, 445 N.E.2d 19, 25-26 (Ill. App. Ct. 1982): The court, interpreting Illinois law, did not analyze the sufficiency of notice given in light of the purposes of the notice rule.  Instead, the court summarily applied the lenient approach with virtually no discussion and without acknowledging other approaches.

- Barrington Corporation v. Patrick Lumber Company, Inc., 447 So.2d 785, 788-789 (Ala. Civ. App. 1984): The court, interpreting Alabama law, did not analyze sufficiency of the notice in light of the purposes of the rule.  Moreover, the case is factually distinguishable from the present case because the buyer in Barrington did not continue doing business with the seller after the breaching event.

energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

At the same time, courts have recognized that the irreparable harm element of the preliminary injunction framework may be satisfied on a showing that, absent an injunction, financial hardship would be so severe that it would cause the moving entity to be "completely wiped out," thereby rendering "a later judgment on the merits meaningless."  Stenberg v. Cheker Oil Co., 573 F.2d 921, 924 (6th Cir. 1978).  See also Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995) ("The impending loss or financial ruin of [a] business constitutes irreparable injury.").

However, the moving party must show that irreparable harm is "both certain and immediate, rather than speculative or theoretical."  Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 154 (6th Cir. 1991).  See also Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

In addition, and of critical importance, "the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff."  Smith & Nephew, Inc. v. Synthes (U.S.A.), 466 F. Supp. 2d 978, 982 (W.D. Tenn. 2006).  Thus, "[i]rreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary."  Curtis 1000, Inc. v. Youngblade, 878 F. Supp. 1224, 1248 (N.D. Iowa 1995).  For example, in Occupy Sacramento v. City of Sacramento, No. 11-02873, 2011 WL 5374748 (E.D. Cal. Nov. 4, 2011), an organized group of protesters seeking to demonstrate in a public park sought a temporary restraining order preventing law

12

enforcement from enforcing a city ordinance that prevented the public from being in the park after 11:00 p.m.  The court concluded that the group's "apparent failure to diligently pursue other forms of relief . . . tends to undermine [its] claim that the extraordinary remedy of a TRO is warranted," where the group knew that it could seek a permit extending park hours and, yet, failed to do so.  Id. at *4.

Defendant argues that Plaintiff cannot satisfy its burden on the irreparable harm element of the Overstreet framework for four main reasons.  As explained below, the Court finds three of the arguments unpersuasive, but concludes that one argument does defeat Plaintiff's contention of irreparable harm.

First, Defendant contends that the precarious financial position in which Plaintiff now finds itself is not the result of it being deprived of the $3.868 million in dispute here.  Rather, Defendant argues that Plaintiff's current troubles are the result of years of financial instability and poor performance, as evidenced by the numerous concessions sought and obtained from Defendant by Plaintiff throughout the parties' relationship.

Plaintiff downplays its performance issues and links its concession requests to Defendant's demands for increased volumes.  See Pl. Supp. Br. at 12 (Dkt. 39) ("Defendant, at best, only demonstrated that the parties routinely renegotiated to meet Defendant's need for more volume and Plaintiff's need for price increases to address that volume.").  Plaintiff argues that "this type of 'back-and-forth' is common in the automotive supply world," that the parties' contracts "contemplate[] this type of give and take," and that it has proffered sufficient evidence through the testimony of its president, David W. Jaeger, and treasurer, Jay N. Brown, that the deprivation of the $3.868 million in dispute here is the proximate cause of its current troubles.  Id.

Based on the record as it stands today, the Court is unable to find Defendant's argument persuasive.  Determining the cause of a company's financial difficulties would

require a far more elaborate exercise in fact-finding than can be accomplished on the record developed to date.  Virtually no financial records have been provided to the Court, nor has the history of Plaintiff's financial challenges been presented with requisite specificity. Moreover, expert testimony might well be required for the Court to perform a reasonable causation analysis.  Further, Defendant's theory – that Plaintiff's history of financial instability is the cause of the crisis – appears to be undercut by the limited history that was presented.  Apparently, Plaintiff has not had any financing difficulties since emerging from bankruptcy – at least not of the kind presented here, where a lender threatens a total cutoff of required daily financing – despite a long history of economic difficulties.  The only event that appears to be different in the present circumstances is Defendant's refusal to pay.  While Plaintiff's financial instability may well have been a contributing factor, the Court cannot adopt, based on the current record, Defendant's theory that Plaintiff's own financial difficulties have caused the current crisis.

Second, Defendant argues that the relief sought by Plaintiff – reversal of the $3.868 million setoff – would not ultimately cure Plaintiff's financial troubles, even if such relief were ordered by the Court.  Defendant points out that, pursuant to Plaintiff's arrangement with its lender, Plaintiff's current borrowing base deficit of almost $2 million would be "swept" from Plaintiff's account by the end of the day on which the $3.868 million is deposited, leaving only approximately $1.8 million for use by Plaintiff.  Defendant argues that this $1.8 million "one-time cash infusion" would neither increase Plaintiff's borrowing base, nor allow Plaintiff to operate for longer than a few days, given that Plaintiff's daily operations cost something under $450,000.  Hr'g Tr. at 204-206.

The Court rejects this argument.  Plaintiff's theory on irreparable harm is that it cannot continue operating without continued financing from its lender and, if Plaintiff does not restore its current borrowing base deficit, it will lose that financing.  With continued

financing, Plaintiff would continue to operate on a positive cash flow basis, which it is doing now, given that Wells Fargo has not yet terminated the line of credit.  Hr'g Tr. at 15. Therefore, the fact that Plaintiff may not have little cash left over after its borrowing base deficit is restored misses the point.

Third, Defendant argues that Plaintiff has failed to present evidence that Wells Fargo will actually cutoff Plaintiff's financing if preliminary injunctive relief is denied.  Defendant argues that this undercuts Plaintiff's claim of irreparable harm, given that Plaintiff could continue operating so long as its ability to obtain financing remained uninterrupted. Additionally, Defendant argues that, while Wells Fargo has an incentive to urge Plaintiff to pursue preliminary injunctive relief – because some of the monetary relief awarded would be transferred to Wells Fargo in short order – it lacks any incentive to put Plaintiff out of business by cutting off its financing, as that would "make recovery of the funds owed [by Plaintiff] to Wells Fargo that much more difficult."  Def. Supp. Br. at 8 (Dkt. 38).

The Court also rejects this argument.  While no evidence has been directly proffered through a Wells Fargo representative regarding the date on which it will cutoff Plaintiff's financing, Plaintiff's treasurer testified that Wells Fargo has given Plaintiff a "drop dead date" of March 20, 2013, which was just two days ago.  Hr'g Tr. at 183.  In any event, it is reasonable to conclude that a borrower with a negative borrowing base of nearly $2 million will not desist for long from taking some action.

Defendant's final argument on irreparable harm, however, is convincing.  Defendant argues that Plaintiff cannot show irreparable harm because it has not attempted to resolve its current financial predicament through other avenues.  In particular, Defendant argues that Plaintiff could have – but has not – attempted to obtain the cash it now seeks from Defendant to stay alive through: (1) its affiliates, namely, Revstone Industries (Plaintiff's parent) and Eptec (a guarantor of Plaintiff's obligations to Wells Fargo); (2) its current customers, who,

Defendant argues, would not let Plaintiff go out of business because they depend on Plaintiff's parts to stay alive themselves; and (3) alternative financing, which Defendant argues Plaintiff could receive by leveraging the $12 million in equity that it has in fixed assets. Plaintiff did not address these arguments in its supplemental brief submitted after the evidentiary hearing held on the issue of irreparable harm.

These arguments are well-taken. The Court is simply not convinced that Plaintiff has exhausted other reasonable options at its disposal to resolve its current financial situation. First, Plaintiff's treasurer, Jay Brown, testified that Plaintiff has not tried asking its affiliates for assistance in resolving its current financial crisis. Hr'g Tr. at 212. Notably, at least one of Plaintiff's affiliates (Eptec) is – in Plaintiff's own words – "highly profitable." Id. at 202. Brown explained that there may be covenants that restrict transfer payments to affiliated companies. Id. at 203. But covenants can be waived, and Brown gave no explanation why Plaintiff did not pursue a waiver of any such covenant and secure assistance from Eptec.

Nor was there any explanation why Revco Industries, as the parent company, could not provide the financial wherewithal to satisfy Wells Fargo. Brown testified that he had heard Revco had provided assistance of $1.1 million to release a garnishment lien issued by another creditor of Plaintiff's. Id. at 203. It seems strange that Plaintiff presented no evidence that it had approached its parent for assistance as part of an effort to save Plaintiff from closing its doors.[12]

---

[12] Notably, at the hearing held in this matter on March 6, 2013, Plaintiff's counsel effectively conceded that the resources of Plaintiff's affiliates would be available to address Plaintiff's current predicament. See 3/6/13 Hr'g Tr. at 13-14 (Dkt. 29) (stating, in response to the Court's inquiry whether Plaintiff could furnish collateral to a bonding company, that "two entities that are [in the] borrowing base certificate are in a better position financially than Contech Castings" and that they could assist in connection with the bond issue). At the evidentiary hearing on March 15, 2013, Brown confirmed that "Contech has the ability to arrange for a bond. . . . of some magnitude. . . . [w]ith Revstone's assistance in some fashion." 3/15/13 Hr'g Tr. at 195-196. Plaintiff has entirely failed to explain why these same assets could not be used to resolve the crisis underlying its request for the extraordinary relief it seeks through the filing of the present motion.

It is puzzling, as well, that Plaintiff has not approached its customers for assistance. Plaintiff's president testified that Plaintiff has a history of seeking concessions and accommodations from its customers, including Defendant, Ford, Nexteer, JTekt, and Thyssenkrup. Hr'g Tr. at 86-88. Plaintiff's treasurer similarly testified. Id. at 187-188. Plaintiff never explains why it could not approach its customers today – as it had done so many times in the past – with similar requests. Moreover, Plaintiff has emphasized throughout these proceedings that – because it is a sole-source provider – its customers depend on Plaintiff for parts. Given Plaintiff's undisputed importance to the supply chain, Defendant's position is sound that Plaintiff's customers would not likely allow Plaintiff to shut down.

Another puzzle – and perhaps the most significant one – is Plaintiff's failure to pursue refinancing. Brown testified that Plaintiff currently has fixed assets worth $20 million, encumbered with only $8 million in debt. Hr'g Tr. at 208-210. Despite the availability of approximately $12 million in equity in these fixed assets, Plaintiff has not even attempted to obtain financing using those assets as collateral. Id. When asked by the Court whether "there [has] been any effort to see if financing can be arranged using those fixed assets as some kind of security," Brown testified that Plaintiff could "hypothetically" generate additional capital using these assets but, without further explanation, testified that it "[p]robably" could not do so "under the current problems [Plaintiff has] with Wells Fargo and ZF and everything else." Id. Thus, Plaintiff has not even attempted to leverage $12 million in collateral, which, putting it mildly, is perplexing, given the gravity of the financial crisis claimed by Plaintiff.

In short, the glaring failure of Plaintiff to pursue other reasonable alternatives to avoid the harm it claims is imminent fundamentally undermines its contention of irreparable injury. See, e.g., Occupy Sacramento, 2011 WL 5374748, at *4; Smith & Nephew, 466 F. Supp. 2d at 982; Curtis 1000, 878 F. Supp. at 1248. Because the Court concludes that Plaintiff has not

sufficiently attempted to resolve the current financial crisis it now faces using other avenues that appear to be reasonably available to it, Plaintiff has not satisfied its burden of demonstrating irreparable injury.[13]

### 3. Substantial Harm to Others

Plaintiff argues that others will suffer harm, absent an award of preliminary injunctive relief, because the denial of such relief would force Plaintiff to shut down, thereby disrupting the operations of Plaintiff's customers who depend on Plaintiff, as a sole source, for parts. Defendant argues that it – and not Plaintiff – will suffer harm if preliminary relief is granted because there is a realistic possibility that, if ordered to pay Plaintiff, Defendant will never see that money again.

The Court concludes that this factor weighs in favor of denying preliminary relief. Plaintiff argues that substantial harm will result to its customers absent an award of preliminary injunctive relief; however, there has been no evidence offered in support of this

---

[13] Plaintiff relies on a number of cases in support of its position on irreparable injury; however, none of them is pertinent here. Some of the cited cases are distinguishable from the present case because they involve a buyer suing a seller to continue supply of a product, rather than (is in our case) a seller suing for money damages. See, e.g., Almetals, Inc. v. Wickeder Westfalenstah L, GmbH, No. 08-10109, 2008 WL 4791377 (E.D. Mich. Oct. 29, 2008) (court issued permanent injunction requiring the seller to abide by the payment terms contained in its contract with the buyer); TRW, Inc. v. Indus. Sys. Assocs., Inc., 47 F. App'x 400 (6th Cir. 2002) (appellate court affirmed district court's grant of a preliminary injunction requiring a supplier to keep supplying). Other cases are distinguishable because they involve equitable requests for job reinstatement or the return of property. See, e.g., Stenberg v. Cheker Oil Co., 573 F.2d 921 (6th Cir. 1978) (appellate court ordered the district court to issue a preliminary injunction requiring the lessor of a gasoline service station to reinstate his lessee to the lessee's prior position as manager of the station); Jaup v. Olmstead, 55 N.W.2d 119 (Mich. 1955) (ordering return of property). And still others are distinguishable because there was no evidence presented, or argument made by the party resisting preliminary injunctive relief, that the harm claimed by the moving party in support of the request for preliminary injunctive relief could be prevented. See, e.g., Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373 (6th Cir. 1995) (appellate court ordered district court to issue a preliminary injunction requiring the publisher of a book to pay royalties to the licensor where evidence in the record demonstrated that, absent an injunction, the licensor would go out of business); Newlife Homecare Inc. v. Express Scripts, Inc., No 07-761, 2007 WL 1314861 (M.D. Pa. May 4, 2007) ("concrete evidence" presented that plaintiff, a licensed pharmacy, would go out of business or be forced into bankruptcy – and its customers may suffer life-threatening illnesses – absent a preliminary injunction).

position – such as testimony from officials at other companies – and the Court does not find the position to be realistic under the circumstances here.  Assuming the consequences of Plaintiff's claimed impending shutdown would really be as catastrophic to the rest of the supply chain as Plaintiff claims, Plaintiff's customers would have an overwhelming incentive to – and likely would – keep Plaintiff afloat, thereby avoiding the substantial harm that Plaintiff cites in support of its position on this element.

By contrast, Defendant's claim of potential harm cannot be easily dismissed.  While Plaintiff has made a strong showing of likely succeeding on the merits, that showing is not unassailable.  Discovery, which has not yet begun, as well as internal investigations, may well reveal that Plaintiff was, indeed, put on notice of claimed breaches.  Although the Court has made a determination, for purposes of the present motion, that Plaintiff is likely to succeed on the waiver-of-damage-claims issue, the evidence on that issue has not necessarily been fully developed.  See Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) (in preliminary injunction proceedings "the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy").  Thus, it is possible that Defendant may be able to defeat the waiver argument and, ultimately, prevail on its counterclaims, including claims unrelated to the BMW recall.  In such circumstances, Defendant would be entitled to offset its damages against amounts owed to Plaintiff.  See Walker v. Farmers Ins. Exch., 572 N.W.2d 17, 19 (Mich. Ct. App. 1997) ("Setoff is a legal or equitable remedy that may occur when two entities that owe money to each other apply their mutual debts against each other.").  However, if Defendant is ordered to pay $3.868 million now and Plaintiff is no longer economically viable by the end of this case, that offset right may become worthless.  Accordingly, that potential harm weighs in the balance.

Because the harm to others that Plaintiff raises appears remote, while Defendant's fears cannot be dismissed, this balance-of-harms factor weighs in favor of denying the motion.

### 4.  Public Interest

Plaintiff argues that the public interest weighs in favor of granting preliminary relief because such relief would: (i) prevent layoffs, (ii) allow Plaintiff to continue operating, (iii) allow Plaintiff's customers to continue operating, (iv) preserve Plaintiff's business reputation, and (v) require Defendant to abide by its contractual duties.  Defendant argues that the public interest militates against granting injunctive relief because injunctive relief is reserved for "real emergencies, not circumstances of the moving party's own making," Def. Resp. at 20 (Dkt. 15), and Plaintiff should not be rewarded for failing to live up to its contractual obligations.

Plaintiff's argument on this element assumes that it will actually have to shut down if preliminary injunctive relief is denied.  For the reasons stated above, the Court does not find that possibility likely.  If the Court is wrong and Plaintiff does shut down, that result will be at least partially due to Plaintiff's failure to diligently pursue other avenues for maintaining its financing needs.  The public interest does not require a court to assist a supplicant for equity who has not acted diligently.  See Reams v. Vrooman-Fehn Printing Co., 140 F.2d 237, 242 (6th Cir. 1944) ("It is well settled that 'equity aids the vigilant.'").

### 5.  Balancing the Factors

While no one factor is dispositive in deciding a motion for injunctive relief, courts have historically assigned great weight to the strength of the irreparable-injury showing.  See 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, Federal Practice & Procedure § 2948.1, p. 139 (2d ed. 1995) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not

granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered . . .").  The Sixth Circuit agrees that it is "typically regarded as the most important" factor.  Lexington-Fayette Urban Cnty. Gov't v. BellSouth Telecomms., Inc., 14 F. App'x 636, 639 (6th Cir. 2001).  Its elevated status in the hierarchy of equitable considerations is reflected in the number of cases holding that injunctive relief should not be awarded in its absence.  See City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (injunction "unavailable absent a showing of irreparable injury"); Patio Enclosures, Inc. v. Herbst, 39 F. App'x 964, 967 (6th Cir. 2002) ("[T]he demonstration of some irreparable injury is a sine qua non for issuance of an injunction."); Friendship Materials, Inc. v. Mich. Brick, Inc., 679 F.2d 100, 103 (6th Cir. 1982) ("Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may be issued.").

Here, Plaintiff has posited a theoretically justifiable claim of irreparable injury – as the destruction of its business surely would be – but it has utterly failed to show that the crisis is preventable only through injunctive relief.  In fact, the crisis it faces appears entirely avoidable through a number of avenues that could have been explored, but were not for reasons not adequately explained.  Seeking the assistance of a parent company, concessions from customers, or refinancing using unencumbered assets all present themselves as reasonable alternatives, based on common sense and the record developed in this case.  Inexplicably, Plaintiff did not pursue these alternatives.  The Court is left to conclude that the crisis is likely avoidable, and thus no injury is truly irreparable.  The absence of a viable showing of irreparable injury coupled with the law's tradition of assigning great significance to this factor prompts the Court to accord significant weight to Plaintiff's failure to establish this factor.

The Court is mindful of Plaintiff's strong showing of likely success on the merits. But, as noted above, that showing is not necessarily unassailable.  Moreover, given that there has been no effective showing of irreparable harm, Plaintiff's ultimate success on the merits – should that be the case – will make it whole.  To hold otherwise – by allowing a strong merits showing to be controlling in the absence of irreparable harm – would be to create a novel summary judgment-like technique, which would allow a plaintiff with a strong case on the merits to obtain a money judgment without complying with the rigors of the prescribed summary judgment practice.  Nothing in equity jurisprudence supports such a result in the absence of irreparable harm.

The other injunction factors of balance-of-harms and the public interest confirm the appropriateness of the Court's conclusion.  In the absence of any showing of irreparable injury, Plaintiff has shown no harm that should be balanced against potential harm to Defendant.  And without irreparable harm, the potential harms to the public that Plaintiff posits simply evaporate.

Taking all the factors into account, the Court concludes that injunctive relief is not warranted.

## IV.  CONCLUSION

For the reasons stated, Plaintiff's motion for a temporary restraining order and preliminary injunction (Dkt. 6) is denied.

SO ORDERED.


Dated:  March 22, 2013                          s/Mark A. Goldsmith              
      Flint, Michigan                          MARK A. GOLDSMITH
                                United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 22, 2013.

s/Deborah J. Goltz
DEBORAH J. GOLTZ
Case Manager
